[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 14, 2002
THOMAS K. KAHN
CLERK

No. 01-13606

_____

D. C. Docket No. 99-00042-CV-WLS

WILLIE SANTONIO MANDERS,

Plaintiff-Appellee,

versus

THURMAN LEE individually and as employee
of the City of Homerville, ALAN BROWN, individually
and as employee of Homerville, BART CREWS, individually,
and an esmployee of the City of Homerville, CITY OF
HOMERVILLE, CLINCH COUNTY, GEORGIA,

Defendants,

WINSTON PETERSON, individually and as employee of
Clinch County, Georgia,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(March 14, 2002)

Before BLACK and HULL, Circuit Judges, and RYSKAMP[*], District Judge.

HULL, Circuit Judge:

Plaintiff Willie Santonio Manders sued the defendant Winston Peterson, individually and as Sheriff of Clinch County, Georgia, for injuries caused by excessive force against Manders while detained in the county jail. This interlocutory appeal presents the question of whether a Georgia sheriff in his official capacity is an agent for the state, not the county, when performing his law enforcement duties as to use of force, and thus is entitled to Eleventh Amendment immunity from suit under 42 U.S.C. § 1983.

In the past, our circuit has treated § 1983 suits against Georgia sheriffs in their official capacities as suits against counties. Although those decisions did not analyze whether a sheriff under Georgia law actually represents the state or the county, we are constrained to follow them and must affirm the district court's denial of summary judgment to Sheriff Peterson in his official capacity.

However, as explained herein, we question the correctness of those decisions. We believe that Sheriff Peterson in his official capacity is an agent for the State of Georgia, not Clinch County, when performing his law enforcement duties as to use of force, and is protected by Eleventh Amendment immunity.

## I. BACKGROUND

*A. Facts*

---

[*]Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

2

Clinch County, Georgia is a small rural county with a population of approximately 6,000. As the elected Sheriff, the defendant Winston Peterson ("Sheriff Peterson") is responsible for the operation of the jail in Clinch County, for establishing the policies and procedures at the jail, and for hiring, training, and supervising his deputies who work in the jail. Sheriff Peterson's deputy and chief jailer was the defendant Alan Brown.

On May 18, 1997, police officers from the City of Homerville arrested the plaintiff Willie Santonio Manders ("Manders") and transported him to the jail. As Manders was being escorted into the holding cell at the jail, one of the City police officers stated that Manders had "hit him" earlier.[1] According to Manders, deputy Brown and a City police officer then repeatedly struck him across the head, neck, and face and banged his head against a wall. Manders suffered from a bruised, swollen face, and the beating affected him emotionally, eventually leading to a stay in a mental hospital.

The morning after the beating, Manders wrote a statement for jail officials, wherein he stated, "They had to be rough with me to let me know that they mean business." In his deposition, Manders testified that Sheriff Peterson and some other officer forced him to write this statement. That same day Manders was released from jail. Afterwards, Manders's mother met with Sheriff Peterson to discuss the beating of her son. According to Manders's mother, Sheriff Peterson

---

[1] Prior to his arrest, Manders had punched a City of Homerville police officer. The parties dispute what happened between the time Manders was brought into the jail and the time he was placed in the holding cell. We, however, recount the evidence in the light most favorable to Manders, the non-moving party on a motion for summary judgment.

3

responded to her concerns about the beating as follows: "[T]hat happens sometimes when they bite and scratch." Sheriff Peterson did not investigate the beating incident.

Manders also introduced into evidence the Policy and Procedural Manual (the "Manual") of the Clinch County Sheriff's Department. In his deposition, Sheriff Peterson testified that he published the Manual in either 1989 or 1990, drafting some of the policies himself and adopting some state policies. The Manual requires that "[e]ach case involving physical or defensive force be reported in writing to the Sheriff," as follows:

(A)    Notification of Supervisor

1.    The Sheriff shall be immediately informed of each incident involving the use of force by officers of this Department. Such notification shall be on the same date of the incident.

2.    Each case involving physical or defensive force shall be reported in writing to the Sheriff.

3.    Each officer present or assisting in an arrest or incident requiring force shall be prepared to submit a report supplement describing the incident if requested.

Deputy Brown, however, never submitted a written report indicating he used force with Manders, and Sheriff Peterson never required deputy Brown to do so even after having met with Manders's mother.

In addition to the report requirement, the Manual discusses both non-deadly and deadly force by an officer in the performance of his duties. The Manual provides that non-deadly force may be used by an officer in these situations:

1.    When necessary to preserve the peace, prevent commission of offenses, or

4

prevent suicide or self-inflicted injury.

2.      When preventing or interrupting a crime or attempted crime against property.

3.      When making lawful arrests and searches, overcoming resistance to such arrest and searches, and preventing escapes from custody.

4.      When in self defense, or defense of another against unlawful violence to his person.

The Manual also discusses in detail when use of deadly force is justified. Sheriff Peterson does not have any other written or standard operating procedures for the use of force at the jail or for formal citizen complaints.

*B.      Amended Complaint*

On March 24, 1999, Plaintiff Manders filed his complaint. He promptly amended it on April 20, 1999, naming numerous defendants. The only two remaining defendants, however, are Clinch County, Georgia, and Sheriff Peterson in his official capacity.[2] The amended complaint asserted that at the time of the acts complained of, the defendant Peterson was acting both individually and as an agent of and representative of Clinch County and was operating under the color of state law.

In his amended complaint, Manders further claims that Clinch County and Sheriff Peterson were responsible for establishing policies regarding the use of force at the jail and for implementing those policies by training, monitoring, and

---

[2]Manders's amended complaint sued these other defendants: (1) Truman Lee, individually and as an employee of the City of Homerville; (2) Chris Crews a/k/a Bart Crews, individually and as an employee of the City of Homerville; (3) the City of Homerville, Georgia; (4) Alan Brown, individually and as an employee of Clinch County; and (5) Sheriff Peterson, individually. All of these defendants have been dismissed or granted summary judgment.

disciplining deputies to ensure that the use-of-force policies were followed. According to Manders, deputy Brown beat him, and Clinch County and Sheriff Peterson permitted deputy Brown's use of excessive force. Manders also asserts that Clinch County and Sheriff Peterson failed to provide his deputies proper training and oversight regarding use of force at the jail and failed to promulgate rules and regulations adequate to regulate his deputies' conduct, and that this failure caused the beating suffered by Manders.

In addition, the amended complaint alleged that Sheriff Peterson had negligently hired and retained deputy Brown. More specifically, it alleged that Sheriff Peterson knew or should have known that deputy Brown had a history and reputation for violent treatment of prisoners both during and prior to his employment as a deputy sheriff at the jail. The amended complaint asserted that the beating of the plaintiff Manders would not have occurred but for Sheriff Peterson's negligent hiring and retention of deputy Brown.

Manders sought damages against Clinch County and Sheriff Peterson, including punitive damages from Sheriff Peterson. Manders further requested a mandatory injunction whereby the County would be required to revise its policies, guidelines, and regulations on the use of force.[3]

---

[3] A reader of the amended complaint may wonder (a) whether it purports to sue Sheriff Peterson only individually or also in his official capacity, and (b) whether all the § 1983 claims against Clinch County are also made against Sheriff Peterson in both capacities. In particular, the amended complaint appears to assert a negligent hiring claim against only Sheriff Peterson and to allege the other § 1983 violations against only the defendant Clinch County.

Nonetheless, what is clear and undisputed is that the parties and the district court litigated this lawsuit against Sheriff Peterson (a) in both his individual and official capacities and (b) as if all of Manders's § 1983 claims against Clinch County were also made against Sheriff

*C.* *Summary Judgment Motions*

The defendants Clinch County and Sheriff Peterson filed a joint motion for summary judgment on all claims. The district court granted summary judgment (a) to Sheriff Peterson in his individual capacity as to all claims, (b) to Clinch County and Sheriff Peterson in his official capacity as to Manders's § 1983 claim for the negligent hiring and retention of deputy Brown, and (c) to Clinch County and Sheriff Peterson as to all claims for injunctive relief, stating Manders "lacked the requisite personal stake in the outcome," apparently because Manders was no longer in the jail. Manders did not appeal or cross-appeal any of the rulings granting summary judgment to the defendants.

The district court, however, denied summary judgment with respect to the use-of-force policy claims under § 1983 against Clinch County and Sheriff Peterson in his official capacity. Although Clinch County did not appeal, Sheriff Peterson did. Before appealing, Sheriff Peterson in his official capacity filed a motion for reconsideration, emphasizing that he was a state, not a county, official when performing his law enforcement duties and was entitled to Eleventh Amendment immunity. After the district court denied his motion, Sheriff Peterson

---

Peterson in both capacities. *See Marsh v. Butler County,* 268 F.3d 1014, 1024 n. 4 (11th Cir.2001) (*en banc* ) (concluding that this Court would "decide th[e] case as one in which the complaint purports to sue the Sheriff in both her official and individual capacities," even though the text of the complaint did not state an individual capacity claim, because "the parties and the district judge clearly litigated the case in that way"). Additionally, never did Sheriff Peterson challenge Manders's amended complaint (a) on the specific ground that it did not even purport to assert a claim against him except in his individual capacity, or (b) on the specific ground that the only claim in the complaint against Sheriff Peterson was for the negligent hiring and retention of deputy Brown.

7

timely filed this interlocutory appeal.[4]

## II. PRIOR PANEL PRECEDENT CONTROLS

### A.    *Question Presented*

This appeal is by only Sheriff Peterson in his official capacity and involves only Manders's § 1983 claims regarding Sheriff Peterson's law enforcement duties and policies as to use of force and his training, supervising, and disciplining of his deputies regarding use of force.

It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent. *See McMillian v. Monroe County,* 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). It is also settled that Eleventh Amendment immunity extends not only to states of the Union but also to "state agents and state instrumentalities," *Regents of the University of California v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), or stated otherwise to "arm[s] of the state" as well as state officials. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*

---

[4]The fact that Manders sued the county and the sheriff in his official capacity as separate defendants and that this appeal is by the sheriff in his official capacity, and not the county, are distinctions that make a difference in our jurisdiction to hear this interlocutory appeal. When a county appeals asserting that a sheriff is not a county policymaker under § 1983, that presents a defense to liability issue as to the county. *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 42-43, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). In contrast, when a sheriff in his official capacity appeals asserting that he represents the state and is entitled to Eleventh Amendment immunity, this presents an immunity from suit issue. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 147, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity.").

429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[5] But the Eleventh Amendment does not extend to counties and similar municipal corporations. *Id.* The parties do not dispute that Eleventh Amendment immunity bars Manders's § 1983 claims if Sheriff Peterson is an agent of the state, and not the county. Instead, their dispute is over what entity Sheriff Peterson in his official capacity represents when performing his law enforcement duties at issue here. Is the sheriff in his official capacity an agent of the State of Georgia or Clinch County for purposes of the Eleventh Amendment?[6]

B.     *Prior Panel Precedent*

In the past, this Court has summarily treated official capacity suits against sheriffs in Georgia as suits against counties. *See Wayne v. Jarvis,* 197 F.3d 1098,

---

[5]"Although the express language of the [Eleventh] [A]mendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." *Carr v. City of Florence,* 916 F.2d 1521, 1524 (11th Cir.1990) (citing *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). "[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Georgia has not waived its Eleventh Amendment immunity. The Georgia Constitution expressly provides that "[n]o waiver of sovereign immunity ... shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers or employees by the United States Constitution." Ga. Const. Art. 1, § 2, ¶ 9(f).

[6]A third "entity" possibility is that the sheriff is an agent of the sheriff's department and that a sheriff's department is an independent office that is not subject to either county or state control. The parties have not made this contention, nor have they cited any authority indicating the sheriff's department is a separate or independent legal entity capable of being sued under Georgia law. The "capacity to sue or be sued shall be determined by the law of the state in which the district court is held." Fed.R.Civ.P. 17(b).

What little authority we could locate may explain why the parties do not make this contention. This Court has observed that "Sheriff's departments and police departments are not usually considered legal entities." *Dean v. Barber,* 951 F.2d 1210, 1214 (11th Cir.1992) (dismissing claim against sheriff's department because department was not subject to suit under Alabama law); *see also Shelby v. City of Atlanta,* 578 F.Supp. 1368, 1370 (N.D.Ga.1984) (concluding City of Atlanta police department is not a proper party defendant because department is "merely the vehicle through which the City government fulfills its policing functions").

9

1105 (11th Cir.1999) (stating that "[a]lthough [plaintiff] Wayne did not sue Dekalb County itself, his claim against Sheriff Jarvis in his official capacity is a claim against Dekalb County"); *Alexander v. Fulton County,* 207 F.3d 1303, 1322 n. 14 (11th Cir.2000) (stating "[p]laintiffs' suit against Sheriff Barrett in her official capacity is the functional equivalent of suing the County").[7] In these cases, we did not discuss Eleventh Amendment immunity or whether under Georgia law the sheriff is an agent for the state or the county, as it does not appear the parties raised these issues. Further, in *Vineyard v. County of Murray,* 990 F.2d 1207 (11th Cir.1993), the parties did not challenge on appeal the district court's jury instruction that the sheriff had authority to make policy for Murray County, Georgia, in the area of law enforcement. *See id.* at 1210. Thus we did not examine these issues in *Vineyard* either.[8]

---

[7]In *Wayne,* the plaintiff inmate brought, *inter alia,* a § 1983 claim against the defendants Sheriff Jarvis in his official capacity and the Sheriff's Department based on their failures to provide adequate medical care and to protect him from other inmates. 197 F.3d at 1100-02. We "proceed[ed] to address the merits of the district court's grant of summary judgment in favor of the County, which was properly sued in this case through the official capacity claim against the Sheriff." *Id.* at 1105. As to the Sheriff's Department, we observed that "[t]he district court noted that 'under Georgia law, the Dekalb County Sheriff's Department is not a legal entity that can be sued apart from the County.' " *Id.* But we concluded that "[r]egardless of whether that is correct, because Wayne's official capacity claim against Jarvis is a claim against the County, his claim against the Sheriff's Department of the County is redundant." *Id.*

In *Alexander,* the plaintiff employees brought Title VII and § 1983 claims against the defendants Fulton County and Sheriff Barrett, individually and in her official capacity. 207 F.3d at 1313-14. After discussing whether Sheriff Barrett in her individual capacity was entitled to qualified immunity, this Court did not address whether the County or the Sheriff in her official capacity were liable under § 1983 "[b]ecause Title VII provide[d] an alternative basis for liability." *See id.* at 1321-22. In a footnote, we did note that "Plaintiffs' suit against Sheriff Barrett in her official capacity is the functional equivalent of suing the County." *Id.* at 1322 n. 14.

[8]In *Vineyard,* the plaintiff, alleging that the sheriff's deputies beat him, sued Murray County and the sheriff in his official capacity, among others, under § 1983 because of inadequate policies of supervision, training and discipline of deputies, which caused the violation of the plaintiff's rights. 990 F.2d at 1208. After a jury verdict against the sheriff in his official capacity and Murray County, they asserted errors on appeal, but did not challenge this jury instruction as error. *See id.*

In contrast, here the legal question of whether a sheriff under Georgia law represents the state or the county is vigorously debated because (1) Manders sued Clinch County and Sheriff Peterson in his official capacity as separate defendants,[9] and (2) the Sheriff has appealed the denial of summary judgment, claiming that he is a state official, that a claim against him in his official capacity is a claim against the state, not the county, and that therefore he is entitled to Eleventh Amendment immunity. Although this question was not scrutinized in our earlier decisions, we are bound by the holding of the first panel of this Court to address an issue of law, unless and until that holding is overruled *en banc* or by the Supreme Court. *See, e.g., Smith v. GTE Corp.,* 236 F.3d 1292, 1300 n. 8, 1302-03 (11th Cir.2001); *Turner v. Beneficial Corp.,* 236 F.3d 643, 648-50 (11th Cir.2000), *vacated by* 242 F.3d 1023 (11th Cir.2001) (*en banc); United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). Therefore, under our prior panel precedent rule, we treat Manders's § 1983 claims against Sheriff Peterson in his official capacity as claims against Clinch County and deny him Eleventh Amendment immunity.

Nonetheless, we question the correctness of that precedent. We first outline the relevant factors in determining Eleventh Amendment immunity. We then apply them to sheriffs under Georgia law. Doing so causes us to conclude that Georgia sheriffs are agents of the state, not counties, when performing their

---

[9]It could be argued that the fact that Sheriff Peterson was sued separately indicates he is a state agent because if he represents the county, then the official capacity claim against him is redundant and not necessary.

11

law enforcement duties as to use of force.[10]

### III. WHY PRIOR PRECEDENT NEEDS REEXAMINATION

*A.     Eleventh Amendment Factors*

While this Court has never scrutinized whether Georgia sheriffs are agents of the state or county, this Court has decided that issue as to Alabama and Florida sheriffs.  Our decisions about other states' sheriffs are not directly applicable because the answer to whether an official is an agent of a particular state is dependent in large part upon that state's law.  Nonetheless, we start with these decisions because they indicate the relevant factors when examining whether a sheriff represents the state or the county for purposes of the Eleventh Amendment.

1.     *Alabama Sheriffs*

We considered three factors in concluding that Alabama sheriffs, deputy sheriffs, and jailers are state officials protected by Eleventh Amendment immunity.  *See Lancaster v. Monroe County,* 116 F.3d 1419, 1429-30 (11th Cir.1997) (sheriffs and jailers);  *Carr v. City of Florence,* 916 F.2d 1521, 1525-27 (11th Cir.1990) (deputy sheriffs).  In *Lancaster,* we considered:  (1) the relationship between sheriffs and jailers under Alabama law;  (2) the control that the county exercises over sheriffs and jailers;  and (3) whether an award of

---

[10]Our review of legal issues is *de novo.  See In re Burke,* 146 F.3d 1313, 1316 (11th Cir.1998). Because the question here requires interpretation of the Eleventh Amendment, it is a federal question that we decide "de novo," even though state law must be considered in defining the character of the sheriff's office. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429 n. 5, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997);  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

damages would be paid with state funds. 116 F.3d at 1429.[11] *Carr* considered the same factors but as to sheriffs and their deputies. Although *Carr* and *Lancaster* both listed the third damages factor, this Court in both cases ultimately noted that the plaintiff had not presented evidence that a damage award would be paid out of county funds. Therefore, in both cases we concluded that "[i]n the absence of clear evidence that the counties would pay a damages award," we cannot find this policy consideration underlying Eleventh Amendment immunity defeats the claims to immunity. *Lancaster,* 116 F.3d at 1430; *Carr,* 916 F.2d at 1526-27. In both cases we so concluded, even though the salaries of the Alabama sheriffs, deputies, and jailers were paid by the counties. *Lancaster,* 116 F.3d at 1430; *Carr,* 916 F.2d at 1526.

2.    *Florida Sheriffs*

By comparison, our decisions considered four factors in concluding Florida sheriffs were not agents of the state and were not protected by Eleventh Amendment immunity. *See, e.g., Hufford v. Rodgers,* 912 F.2d 1338, 1341-42 (11th Cir.1990).[12] We recently examined the same four factors in determining that

---

[11]While focusing on the sheriffs' jailers, this Court in *Lancaster* also stated that "[t]he district court ruled that Sheriff Tate is a state official and, therefore, Tate was entitled to summary judgment on Ms. Lancaster's § 1983 official capacity claims. That ruling is a correct application of *Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989)." *Lancaster,* 116 F.3d at 1429. This Court has continued to follow *Parker* 's ruling that Alabama sheriffs in their official capacity are entitled to Eleventh Amendment immunity, but this Court *en banc* has overruled *Parker* 's separate holding that Alabama sheriffs are county policymakers in their daily management of county jails for purposes of § 1983. *See Turquitt v. Jefferson County,* 137 F.3d 1285, 1291-92 (11th Cir.1998) (*en banc* ).

[12]Subsequent cases involving Florida sheriffs followed *Hufford v. Rodgers* in concluding that Florida sheriffs are county officials. *See, e.g., Gordan v. Cochran,* 116 F.3d 1438, 1439 n. 1 (11th Cir.1997); *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991).

13

the Florida State Athletic Commission is an arm of the state protected by such immunity. *See, e.g., Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n,* 226 F.3d 1226, 1231-34 (11th Cir.2000). In both decisions, we examined: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Miccosukee Tribe of Indians of Fla.,* 226 F.3d at 1231-34; *Hufford,* 912 F.2d at 1341-42. In *Hufford,* we pointed out that "the Florida Constitution indicates that a sheriff is a county officer," and we discerned in the Florida statutes "no intent for state officials to control or supervise the sheriff." 912 F.2d at 1341-42. We also observed that the sheriff was insured through monies appropriated by the county "as part of a self-insurance fund established by sheriffs of the state of Florida," and we could locate no Florida law providing the sheriff with state funds to pay a judgment. *Id.* at 1342.

Subsequent to *Hufford,* the focus of the Eleventh Amendment immunity analysis in *Regents of the University of California v. Doe,* 519 U.S. 425, 431, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), was on "potential legal liability" and "the risk of adverse judgments," as opposed to requiring that state funds actually pay the judgment. *Id.* at 430-31, 117 S.Ct. 900. In *Regents,* the Supreme Court concluded that the fact that a state university would be indemnified by the federal government for any adverse judgment and costs of litigation and that, therefore, the litigation would have *no impact* on the state treasury did not affect that university's immunity under the Eleventh Amendment. *Id.* The Supreme Court

14

emphasized that "[t]he Eleventh Amendment protects the State from the risk of adverse judgments even though the State may be indemnified by a third party," and "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Id.* at 431, 117 S.Ct. 900; *see Shands Teaching Hosp. and Clinics, Inc. v. Beech Street Corp.,* 208 F.3d 1308, 1311, 1313 (11th Cir.2000) (quoting and applying *Regents* and concluding that two private corporations acted as agents of the state in administering the state's health insurance program and were protected by Eleventh Amendment immunity).

3.      *Control Factor*

We also mention two recent decisions concluding that Alabama sheriffs are state, not county, policymakers for purposes of § 1983 liability because several factors relied on in our Eleventh Amendment precedent were also present and pivotal in those decisions. *See McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Turquitt v. Jefferson County,* 137 F.3d 1285 (11th Cir.1998) (*en banc* ). While the § 1983 policymaker issue in these decisions was a liability question distinct from the threshold immunity issue here, certain factors are common to the analysis of both legal questions. In fact, *McMillian* and *Turquitt* similarly examined how the state law defines the nature of the entity, the relationship between sheriffs, their deputies, and jailers under state law, and the degree of control the state or county maintains over sheriffs, their deputies, and

jailers.[13] Thus, *McMillian* and *Turquitt* are instructive as to how to evaluate those particular factors.

In that regard, *McMillian* and *Turquitt* teach that we must consider the label of state or county officer but also must look beyond that label to what government entity controls sheriffs, their deputies, and jailers. After noting that the § 1983 policymaker question "is dependent on an analysis of state law," the Supreme Court in *McMillian* observed that "[t]his is not to say that state law can answer the question for us by, for example, *simply labeling* as a state official an official who clearly makes county policy." 520 U.S. at 786, 117 S.Ct. 1734 (emphasis supplied). Instead, the Supreme Court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *Id.* Looking beyond labels, the Supreme Court examined Alabama's Constitution, Code, and the interpretation given them by the Alabama courts in order to determine the function of a sheriff under Alabama law. *See id.* at 787-93, 117 S.Ct. 1734.[14]

---

[13]Based on *Turquitt,* a recent *en banc* decision summarily granted Eleventh Amendment immunity to Alabama sheriffs when sued in their official capacities. *Marsh v. Butler County, Alabama,* 268 F.3d 1014, 1028 (11th Cir.2001) (*en banc* ) (stating "Alabama sheriffs are considered arms of the state and protected by sovereign immunity in suits against them in their official capacity" and concluding "[t]he complaint against the Sheriff in her official capacity was thus properly dismissed"); *see Taylor v. Adams,* 221 F.3d 1254, 1256 (11th Cir.2000) (stating "[i]n their official capacity, ... Alabama sheriffs operating jails are state officers protected by Eleventh Amendment immunity" and affirming summary judgment for the Sheriff of Mobile County on Eleventh Amendment immunity grounds).

[14]Similarly, in *McMillian v. Johnson,* 88 F.3d 1573 (11th Cir.1996), *aff'd sub nom McMillian v. Monroe County, Alabama,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), this Court determined that the Alabama Constitution's designation of a sheriff as a state official was relevant but not dispositive in determining whether a sheriff exercises state or county power. *Id.* at 1580-81. We viewed the designation of the sheriff as a state official as evidence of the county's lack of law enforcement power. *See id.* at 1581 n. 4. ("We base our decision not on a sheriff's 'label,' but on the county's lack of law enforcement power, of which a sheriff's designation as a state official is evidence.").

Although the Alabama Constitution provided that the state executive department includes "a sheriff for each county" and, in effect, labeled the sheriff as a state executive officer, *see id.* at 787, 117 S.Ct. 1734, the Supreme Court in *McMillian* did not end its analysis there.  Instead, it examined Alabama Code provisions and noted that the county had no control over the sheriff's law enforcement duties, whereas the Governor and the Attorney General had such control under an Alabama statute.  *Id.* at 790-91, 117 S.Ct. 1734.  Even though Alabama Code provisions suggested that the county had some influence over the sheriff (such as the county's payment of his salary and equipment), and even though the sheriff was elected locally by county voters, the Supreme Court indicated that such factors did not amount to significant control over the sheriff's operations.  *See id.* at 791-92, 117 S.Ct. 1734.

Subsequently, in *Turquitt v. Jefferson County,* 137 F.3d 1285 (11th Cir.1998), this Court *en banc* concluded that "Alabama sheriff[s] act exclusively for the state rather than the county in operating a county jail."  *Id.* at 1288. Although noting that Alabama's Constitution "sends a clear message that a sheriff is a state officer," *id.* at 1289, we too focused on control in deciding the § 1983 policymaker issue.  The state empowered Alabama sheriffs to exercise authority over the jail independent from the county.  *See id.* at 1289-91.  For example, "the sheriff appoints, directs, and controls the deputies and jailers who work at the jail." *Id.* at 1289.  In addition, a state agency, the Alabama Department of Corrections, oversees the county jails, has the authority to regulate them, and must inspect the

17

jails periodically to "aid in securing the just, humane, and economic management of them." *Id.* (internal quotation marks omitted). The Alabama Code did not delegate the county any authority regarding supervision of inmates in a county jail. *Id.* at 1291.

Although Alabama counties maintain the jail structure, appropriate funds for certain necessities to inmates (such as bedding, clothing, electricity, and sanitation), pay the salaries of the sheriff and jail personnel, and remain informed about jail conditions, we determined that these factors did not translate into control over the sheriff in performing his duties related to the daily operation of the jail and supervision of the inmates. *See id.* at 1289-91. We reasoned that the governing Alabama statutes "impose complementary but distinct duties upon counties and sheriffs with respect to the county jails" and that the county has the duty to make available adequate funds while the sheriff has the responsibility to spend those funds. *Id.* at 1290.[15] We concluded that "Alabama sheriffs are not county policymakers in their daily management of county jails." *Id.* at 1292.[16]

4.    *Particular Area or Function*

Before leaving *McMillian* and *Turquitt,* we point out that both decisions

---

[15]The county's lack of control over the sheriff in the operation of the jail was also significant in *Turquitt* because "local governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control." *Turquitt,* 137 F.3d at 1292. Indeed, in *Turquitt* we emphasized the importance of the control factor by characterizing the inquiry in *McMillian* as asking "which government body, under state law, had direct control over how the sheriff fulfilled his law enforcement duty." *Id.*

[16]Concluding that "Alabama counties have no duties with respect to the daily operation of the county jails and no authority to dictate how the jails are run," we stressed that "[t]he sheriffs, on the other hand, have full responsibility for the daily management of the jails, including inmate supervision, and they are not subject to county oversight in their performance of this responsibility." *Turquitt,* 137 F.3d at 1291.

18

focused their attention not only on state law but also on the particular area or function for which the government official was alleged to be the final policymaker. *McMillian,* 520 U.S. at 785, 117 S.Ct. 1734; *Turquitt,* 137 F.3d at 1287. In other words, for § 1983 liability, a determination must be made as to "who the policymaker is and in which particular area that policymaker acted." *Turquitt,* 137 F.3d at 1287-88.[17]

Although Eleventh Amendment immunity has sometimes been viewed as an all-or-nothing proposition in the past, it is developing that the particular area or function in issue now plays a role in Eleventh Amendment analysis. *See, e.g., Shands v. Teaching Hosp. and Clinics, Inc. v. Beech Street Corp.,* 208 F.3d 1308, 1311 (11th Cir.2000). For example, in granting immunity in *Shands,* we indicated that "[t]he pertinent inquiry is not into the nature of a corporation's status in the abstract, but its function or role in a particular context." *Id. Shands* involved two private corporations which had contracted with the state to administer its health insurance program and to provide a preferred provider organization ("PPO") network of medical services. *Id.* at 1310. The health program was funded through annual legislative appropriations. As to these particular functions, this Court concluded that the private corporations were contractually acting as agents or representatives of the state. Thus, we stated that "although these are private

---

[17]In *McMillian,* the Supreme Court also instructed that the policymaker question is not whether the sheriff acts for the state or county "in some categorical, 'all or nothing' manner" but whether the sheriff is a final policymaker for the state or county "in a particular area, or on a particular issue." 520 U.S. at 785, 117 S.Ct. 1734. In addition, "while it might be easier to decide cases arising under § 1983 and *Monell* if we insisted on a uniform, national characterization for all sheriffs, such a blunderbuss approach would ignore a crucial axiom of our government: the States have wide authority to set up their state and local governments as they wish." *Id.* at 795, 117 S.Ct. 1734.

corporations that are neither controlled nor funded by the state, they are protected by governmental immunity when they are clearly acting as agents of the state." *Id.* at 1311.

In *Shands,* we also noted that other circuits had not adopted an approach of total or no immunity but looked to the relief sought and whether the judgment against the private corporation "would implicate the state treasury or interfere with the administration of the state group insurance program." *Id.* We concluded, *inter alia,* that the judgment against the private corporations "would implicate state funds" and that the fact the private corporations had indemnified the state was immaterial. *Id.* at 1313.

In light of the various factors in our Eleventh Amendment precedent, we now examine how Georgia law defines the sheriff's office, the relationship between sheriffs and their deputies, the degree of control the state versus the county maintains over the sheriff's office, where the sheriff's office derives its funds, and the potential legal liability of the state or county for any adverse judgment.

B.     *Georgia Constitution*

Georgia's Constitution points different ways. It first clearly designates the sheriff as a "county officer." Ga. Const. Art. IX, § 1, ¶ 3(a). But in the same paragraph, it then grants the state legislature, not the county board, the authority to establish and control the qualifications, minimum salary, powers, and duties of the sheriff's office. Specifically, the Georgia Constitution provides that sheriffs "shall

be elected by the qualified voters of their respective counties for terms of four years and shall have such qualifications, powers, and duties as provided by general law." Ga. Const. Art. IX, § 1, ¶ 3(a). That paragraph also provides that the "[c]ounty officers ... may be on a fee basis, salary basis, or fee basis supplemented by salary," but that "[m]inimum compensation for said county officers may be established by the General Assembly by general law" and supplemented by local law or by action of the county governing authority. Ga. Const. Art. IX, § 1, ¶ 3(b).

Interpreting this Constitution, the Georgia Supreme Court has instructed that county sheriffs are subject to the control of the Georgia legislature and are *not* county employees. *Bd. of Comm'rs of Randolph County v. Wilson,* 260 Ga. 482, 482, 396 S.E.2d 903, 903 (1990) ("The sheriff ... is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission"); *Chaffin v. Calhoun,* 262 Ga. 202, 203, 415 S.E.2d 906, 907 (1992); *Warren v. Walton,* 231 Ga. 495, 499, 202 S.E.2d 405, 409 (1973).

The Georgia Constitution also prevents county governing authorities from taking any action affecting the sheriff's elective county office. Specifically, the Georgia Constitution provides that the legislative "power granted to counties ... shall not be construed to extend to ... [a]ction affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority." Ga. Const. Art. IX, § 2, ¶ 1(c)(1).

21

Interpreting this provision, the Georgia Supreme Court has concluded that this constitutional restriction on the legislative power granted to counties (i.e., Home rule) prevents counties from taking action affecting the sheriff's office. *See Stephenson v. Bd. of Comm'rs of Cobb County,* 261 Ga. 399, 401-02, 405 S.E.2d 488, 490 (1991); *Warren v. Walton,* 231 Ga. 495, 499, 202 S.E.2d 405, 408-09 (1973).[18]

The Georgia Constitution also provides that "[t]he Governor shall take care that the laws are faithfully executed and shall be the conservator of the peace throughout the state." Ga. Const. Art. V, § 2, ¶ 2. In addition, the Constitution grants to the state legislature the authority to control sheriffs as law enforcement officers. The Georgia legislature has exercised that authority and enacted state laws that directly govern sheriffs, their qualifications, minimum salary, law enforcement powers and duties, training, investigation, and suspension. We review these particular state laws, which we believe make sheriffs answerable to the state as opposed to county boards.

*C.   Qualifications, Salary, and Training*

In enacting Title 15, Chapter 16, entitled "Sheriffs," the Georgia legislature has declared sheriffs to be "the basic law enforcement officer[s] of the several counties of this state," O.C.G.A. § 15-16-1(a), and has mandated a detailed set of qualifications a person must satisfy in order to be a candidate for the sheriff's

---

[18]Although *Warren* involved a prior version of the Georgia Constitution, the same relevant language is in the present version of the Georgia Constitution. *See Warren,* 231 Ga. at 499, 202 S.E.2d at 408-09.

office in any county. *See* O.C.G.A. § 15-16-1(b)-(c). For example, the Georgia legislature requires that a sheriff be at least twenty-five years old, not have a felony record, be a resident of the county for at least two years prior to offering candidacy, and be a registered or certified peace officer or complete the requirements of being a certified peace officer within six months after taking office. *Id.* The state has also set a certain minimum salary for sheriffs to be paid from county funds based on the population of the county. O.C.G.A. § 15-16-20(a) (charting minimum annual salary based on population).

In addition, the state has fixed the training requirements for sheriffs-elect and existing sheriffs in all counties. O.C.G.A. § 15-16-3. If a sheriff fails to comply with the annual training requirements, the Governor is authorized to suspend the sheriff without pay for ninety days. O.C.G.A. § 15-16-3(e)(4). Newly-elected sheriffs must complete specialized training provided by the Georgia Sheriffs' Association with the assistance of the Georgia Public Safety Training Center. O.C.G.A. § 15-16-3(b). Thereafter, sheriffs must complete a minimum of twenty hours of training annually as selected by the Georgia Sheriffs' Association. O.C.G.A. § 15-16-3(e)(1). The Georgia Sheriffs' Association uses state or federal funds to cover all training costs. O.C.G.A. § 15-16-3(d). The state has further mandated that the failure of sheriffs to complete their training requirements results in the loss of their power to arrest. O.C.G.A. § 15-16-3(b), (e)(4).

D.    *Powers and Duties*

The state, not counties, controls the powers and duties of sheriffs. For

example, in O.C.G.A. § 15-16-10, the Georgia legislature has prescribed that it is the duty of sheriffs "[t]o execute and return the processes and orders of the courts and of officers of competent authority ... with due diligence." O.C.G.A. § 15-16-10(a)(1). The state mandates that it is the duty of sheriffs in their respective counties to attend all sessions of certain courts, to publish sales, citations, and other proceedings as required by law, to keep an execution docket, and to keep other specified records. O.C.G.A. § 15-16-10(a)(2)-(6). This same statute also empowers sheriffs "[t]o perform such other duties as are or may be imposed by law or which necessarily appertain to his or her office" and provides that "[i]f any sheriff or deputy fails to comply with any provision of [O.C.G.A. § 15-16-10(a) ], he shall be fined for contempt." O.C.G.A. § 15-16-10(a)(8), (b).

In O.C.G.A. § 42-4-4, the state also requires that the sheriffs operate the jails in their counties and be reimbursed for doing so from the county treasury. Specifically, the Georgia legislature has mandated that "[i]t shall be the duty of the sheriff ... [t]o take from the outgoing sheriff custody of the jail and the bodies of such persons as are confined therein" and to furnish such persons in the jail "medical aid, heat, and blankets, to be reimbursed if necessary from the county treasury." O.C.G.A. § 42-4-4(a)(1)-(2). In addition to requiring sheriffs to furnish "medical aid, heat, and blankets," the state imposes other controls on the sheriffs' operation of their jails. The state has fixed the training requirements for the sheriffs' jail officers by mandating that they complete a training course approved by the Georgia Peace Officer Standards and Training Council and by making jail

24

officers subject to certain powers and authorities of that Council. O.C.G.A. § 35-8-24(a)(1),(c). The state also prescribes that a jailer may not be "guilty of willful inhumanity or oppression to any inmate under his care and custody." O.C.G.A. § 42-4-5; *see also Kendrick v. Adamson,* 51 Ga.App. 402, 402, 180 S.E. 647, 648 (1935). A state agency, the Department of Human Resources, inspects the jail periodically "to ensure against the presence of unsanitary conditions." O.C.G.A. § 42-4-32(c).

The Georgia legislature has also empowered county sheriffs to act beyond the boundaries of their counties of election in certain circumstances. For example, the state requires sheriffs to take persons arrested to a jail of another county if the jail of the sheriff's county is in an "unsafe condition." O.C.G.A. § 42-4-4(a)(3). With respect to § 42-4-4(a)(3) transfers, the Georgia Supreme Court instructs that "[t]he legislature has vested the sheriff alone with the administrative authority to order such transfers," and that a superior court may not order such a transfer sua sponte, although the sheriff would be required to carry out an order of the superior court if the issue of the unsafe conditions of the jail was properly before the trial court. *In re Irvin,* 254 Ga. 251, 253-54, 328 S.E.2d 215, 218 (1985). The state also allows sheriffs to exercise their discretion to "transfer[ ] a prisoner to another jail in another county if the sheriff concludes that such transfer is in the best interest of the prisoner or that such transfer is necessary for the orderly administration of the jail." O.C.G.A. § 42-4-4(b).

In addition, the Georgia legislature has empowered sheriffs to make arrests

25

for traffic violations outside their elected territories. *See* O.C.G.A. § 40-13-30;

*City of Winterville v. Strickland,* 127 Ga.App. 716, 718-19, 194 S.E.2d 623, 625

(1972). A state agency, the Georgia Crime Information Center ("GCIC"), also has

the authority to oversee and regulate sheriffs with regard to the maintenance of

warrants. O.C.G.A. §§ 35-3-30 to -40. Georgia law delegates no such authority to

counties.

E.     *Investigation and Suspension*

The state, not counties, has the right to investigate and suspend sheriffs. If

a sheriff is suspected of any misconduct, including misconduct in the performance

of his duties, the Governor may initiate an investigation funded by the executive

branch of the state government, and the Governor has the authority to suspend the

sheriff. O.C.G.A. § 15-16-26. Specifically, the Governor may determine that an

investigation of a sheriff "should be made as a result of criminal charges, alleged

misconduct in office, or alleged incapacity of the sheriff to perform the functions

of his office." O.C.G.A. § 15-16-26(a). The investigation is conducted by a

committee composed of two sheriffs and the state Attorney General, and the

investigation is funded by the executive branch of the state government. *Id.*

Within thirty days, the committee provides the Governor a report of its

investigation. O.C.G.A. § 15-16-26(b). If the committee recommends suspension,

the Governor may suspend the sheriff for up to sixty days, and may extend that

suspension by thirty additional days. O.C.G.A. § 15-16-26(c). The Governor is

also "authorized to request the district attorney of the county of the sheriff's

26

residence to bring a removal petition against the sheriff." *Id.*[19]

*F.     Deputy Sheriffs and Deputy Jailers*

Under Georgia law, sheriffs exercise authority over their deputies independent from the county. Sheriffs alone hire and fire their deputies. O.C.G.A. § 15-16-23 provides that "[s]heriffs are authorized in their discretion to appoint one or more deputies." Georgia courts have concluded that sheriffs alone are entitled to appoint and discharge their deputies and that deputies (including those serving as jailers) are employees of the sheriff and *not the county. Warren v. Walton,* 231 Ga. 495, 499, 202 S.E.2d 405, 409 (1973) (recognizing that "deputy sheriffs and deputy jailors are employees of the sheriff, whom the sheriffs alone are entitled to appoint or discharge") (internal quotation marks omitted); *Drost v. Robinson,* 194 Ga. 703, 710, 22 S.E.2d 475, 480 (1942); *Brown v. Jackson,* 221 Ga.App. 200, 201, 470 S.E.2d 786, 787 (1996) (noting deputy sheriffs "were employees of the sheriff and not Peach County"); *Wayne County v. Herrin,* 210 Ga.App. 747, 751, 437 S.E.2d 793, 798 (1993); *Pettus v. Smith,* 174 Ga.App. 587, 588, 330 S.E.2d 735, 737 (1985).

Importantly for the question here, Georgia courts have concluded that sheriffs, not counties, are vicariously liable under state law for the actions of their deputies in performing their law enforcement activities. *See, e.g., Lowe v. Jones*

---

[19]The Governor may also require further investigation "by the committee, by the Georgia Bureau of Investigation, by other law enforcement agencies of this state, or by any special committee appointed by the Governor for such purpose." O.C.G.A. § 15-16-26(c). The judicial proceedings for removal of a sheriff are conducted in an manner identical to the removal proceedings of a clerk of the superior court under O.C.G.A. § 15-6-82. *See* O.C.G.A. §§ 15-16-10(b) & 42-4-4(c). A sheriff may be "removed from office by the judge of the court for any sufficient cause, including incapacity or misbehavior in office. The charges must be exhibited to the court in writing and the facts tried by a jury." O.C.G.A. § 15-6-82.

*County,* 231 Ga.App. 372, 373, 499 S.E.2d 348, 350 (1998) (concluding "deputy sheriffs are employees of the sheriff, not the county, and the county cannot be held vicariously liable as their principal");[20] *Brown,* 221 Ga.App. at 201, 470 S.E.2d at 787 (affirming summary judgment for Peach County because the Peach County sheriff, not Peach County, was the proper party to sue); *Pettus,* 174 Ga.App. at 588, 330 S.E.2d at 737-38 (affirming summary judgment for county board of commissioners and concluding, "[a]s the county commissioners had no control over the official duties of the deputy sheriff, they had no duty to determine whether a high-speed driving course rather than a defensive driving course was reasonably required to be supplied to deputy sheriffs"); *Chadwick v. Stewart,* 94 Ga.App. 329, 329, 94 S.E.2d 502, 503 (1956).[21]

Likewise, Georgia courts have also concluded that the counties are not liable for, and not required to give sheriffs money to pay, judgments obtained against sheriffs in civil rights actions. *See Wayne County Bd. of Comm'rs v. Warren,* 236 Ga. 150, 152, 223 S.E.2d 133, 134 (1976) (stating "a county has no

---

[20]In *Lowe,* the plaintiff asserted state law claims but also made a § 1983 claim. 231 Ga.App. at 373, 499 S.E.2d at 350. The Georgia court affirmed the trial court's grant of summary judgment for the defendants on the basis that there was no showing of deliberate indifference and no showing of any official county policy or custom. *Id.* at 374, 499 S.E.2d at 351. The Georgia court did not examine the underlying § 1983 issues of whether the sheriff was a final policymaker and, if so, whether the sheriff was a county or state policymaker.

[21]*Lowe, Brown,* and *Pettus* are clearly based on respondeat superior liability. Although the *Chadwick* court appeared to be applying common-law respondeat superior liability, it also cited Georgia Code Ann. § 24-201, which provided: "All sheriffs, deputy sheriffs, coroners, jailers, constables, and other officers of court shall be liable to all actions, suits, and disabilities whatever, which they, or either of them, shall incur in respect of any matter or thing whatever relating to or concerning their respective offices." This section is now codified in O.C.G.A. § 15-13-1 and provides: "All sheriffs, deputy sheriffs, coroners, jailers, constables, and other officers of court shall be liable to all actions and disabilities which they incur in respect of any matter or thing relating to or concerning their respective offices." The slight differences between these provisions are not material.

liability in connection with the violations of the civil rights of any person by a county officer").  The Georgia Supreme Court in *Warren* first quoted a Georgia statute stating that "A county is not liable to suit for any cause of action unless made so by statute." *Id.* at 151, 223 S.E.2d at 134.[22]  Thus, by statute, the county was not liable.  In addition, the Georgia Supreme Court concluded that "there is no duty of the county to furnish the sheriff with money to settle a civil rights judgment against him." *Id.* at 152, 223 S.E.2d at 134.[23]

G.      *County Civil Service Systems*

Although counties may adopt civil service systems under O.C.G.A. § 36-1-21, sheriffs not only have authority under O.C.G.A. § 15-16-23 to appoint their deputies at their discretion, but also have authority under O.C.G.A. § 36-1-21 to decide whether their deputies are placed under a county civil service system. *See Brett v. Jefferson County,* 123 F.3d 1429, 1434 (11th Cir.1997);  *Gwinnett County v. Yates,* 265 Ga. 504, 508, 458 S.E.2d 791, 794 (1995);  *Wayne County v. Herrin,* 210 Ga.App. 747, 753, 437 S.E.2d 793, 799-800 (1993).  For example, in *Wayne*

---

[22]The statute quoted in *Warren* was Georgia Code Ann. § 23-1502, which is now O.C.G.A. § 36-1-4. In the subsequent decision of *Chatham County Commissioners v. Rumary,* 253 Ga. 60, 315 S.E.2d 881 (1984), the Georgia Supreme Court held the Chatham County Board of Commissioners was required to pay a judgment against a deputy sheriff for damages in an auto collision because Chatham County had enacted a local act providing it would provide a defense and pay final judgments award in courts. *Id.* at 61, 315 S.E.2d at 882.  The Georgia Supreme Court emphasized that "[t]he nature of the Board's liability here is not that of *respondeat superior,* but exists solely by virtue of its voluntary and self-imposed obligation to provide indemnification for the acts of its employees committed during the performance of their duties." *Id.* There is no evidence in this case that Clinch County voluntarily has agreed to provide indemnification.  To the contrary, Clinch County contends it is not liable because the sheriff is not a county policymaker.

[23]As discussed *infra,* Georgia sheriffs sued in their official capacity are protected by sovereign immunity unless waived, and sheriffs sued in their individual capacity are protected by qualified immunity.

*County,* the Georgia court examined O.C.G.A. § 36-1-21, which allows counties to create a civil service system and to include employment positions with elected county officers in that system "upon the written application of the elected county officer." 210 Ga.App. at 748-50, 437 S.E.2d at 796-97.[24] The Georgia court concluded (a) that "deeply embedded in our case law is the notion that the sheriff alone has the authority and power to appoint and fire deputies," but (b) that "the General Assembly has definitely and positively provided for the creation of county civil service systems and conferred on elected officials [such as the Wayne County sheriff] the ability to bring all employees in their office into the system." *Id.* at 751-53, 437 S.E.2d at 798-800.

## H.    *Jailers Who Are Not Deputies*

Under Georgia law, sheriffs may assign their deputies to work at the jail and perform the duties of jailer. *See Kendrick v. Adamson,* 51 Ga.App. 402, 402, 180 S.E. 647, 647 (1935) (deputy sheriff serving as jailer). Sheriff Peterson had

---

[24]In *Wayne County,* when his term was about to end, the Wayne County sheriff applied to have positions in the sheriff's office made subject to the Wayne County personnel system. 210 Ga.App. at 748, 437 S.E.2d at 796. Both Wayne County and Sheriff Warren "fully complied with all [the] requirements set forth in O.C.G.A. § 36-1-21(b) necessary to bring employees of the sheriff's office within the personnel system." *Id.* at 750, 437 S.E.2d at 797. Reconciling §§ 15-16-23 and 36-1-21, the Georgia court held "that once positions in a sheriff's office have been made subject to a personnel or civil service system, a sheriff's authority to appoint deputies pursuant to O.C.G.A. § 15-16-23 is limited to vacancies" created by resignation, retirement, or removal under the applicable personnel or civil service system. *Id.* at 753, 437 S.E.2d at 799.

This same O.C.G.A. § 36-1-21(b) was examined in *Brett,* 123 F.3d at 1434, in which this Court concluded that deputy sheriffs are "at will" employees of the sheriff. We agreed with the district court that "the former deputy sheriffs had no protected property interest under Georgia law because [Sheriff] Compton's efforts to place deputy sheriffs under the civil service system failed to satisfy the statutory requirements of O.C.G.A. § 36-1-21(b)." *Id.* Sheriff Compton had made an oral request, but had not completed the required written application. *Id.* There is no indication in this record that Clinch County has a civil service system or that Sheriff Peterson has taken any action to have his deputies subject to a county personnel system.

30

his deputy Brown serve as chief jailer, so this case does not involve a jailer who is not a deputy. On the other hand, the sheriff may also appoint persons to serve as jailers who are not deputy sheriffs. *See Tate v. Nat'l Sur. Corp.,* 58 Ga.App. 874, 876, 200 S.E. 314, 315 (1938) (noting "[t]here was no evidence that the jailer was also a deputy").

We discuss jailers because the Georgia Code appears to treat jailers who are not deputies differently from deputies. For example, O.C.G.A. § 42-4-1 provides: "By virtue of their offices, sheriffs are jailers of the counties and have authority to appoint other jailers, subject to the supervision of the county governing authority, as prescribed by law." We could not locate, and the parties do not cite, any Georgia decision construing this version of O.C.G.A. § 42-4-1 or discussing precisely what is meant by "subject to the supervision of the county governing authority, as prescribed by law." For example, is it only the sheriff's appointment of jailers that is "subject to the supervision of the county governing authority, as prescribed by law," or is it also the performance of the jailer's duties? Our only guidance is *Wayne County v. Herrin,* 210 Ga.App. 747, 437 S.E.2d 793 (1993), where the Georgia court read the sheriff's power to appoint deputies under O.C.G.A. § 15-16-23, together with O.C.G.A. § 36-1-21, to mean that the sheriff may appoint his deputies "at will" but also may elect in writing to make their appointments subject to the county civil service system as prescribed by law in O.C.G.A. § 36-1-21. *Id.* at 752-53, 437 S.E.2d 793, 210 Ga.App. at 799-800. Thus, without any other guidance from the Georgia courts, we likewise read

31

O.C.G.A. §§ 42-4-1 and 36-1-21 together to mean that the sheriff may appoint his jailers "at will" under O.C.G.A. § 42-4-1 but also may elect in writing to make their appointment subject to the county civil service system and thereby county supervision as prescribed by law in O.C.G.A. § 36-1-21.

In addition, while O.C.G.A. § 15-16-24 provides that "[s]heriffs are liable for the misconduct of their jailers as they are liable for their deputies," that same statute limits a sheriff's liability for a jailer's misconduct to three instances: (1) the sheriff personally benefitted financially, (2) the sheriff had actual knowledge of the nature of the misconduct and acted to cause or failed to act to prevent the misconduct, or (3) the sheriff "failed to exercise ordinary care and diligence to prevent the condition or act which proximately caused the injury complained of." O.C.G.A. § 15-16-24.[25] In contrast, Georgia sheriffs are liable under respondeat superior for the actions of their deputies in the scope of their duties. *See, e.g., Lowe v. Jones County,* 231 Ga.App. 372, 373, 499 S.E.2d 348, 350 (1998); *Brown v. Jackson,* 221 Ga.App. 200, 201, 470 S.E.2d 786, 787 (1996). Thus, Georgia law appears to treat jailers who are not deputies somewhat differently.[26] However,

---

[25]The "misconduct" referred to in O.C.G.A. § 15-16-24 "is a breach of some duty arising out of official capacity." *Tate v. Nat'l Sur. Corp.,* 58 Ga.App. 874, 875, 200 S.E. 314, 314 (1938). In *Tate,* the plaintiff, a municipal prisoner who was injured while in the county jail, brought an action against the surety of a sheriff's official bond. 58 Ga.App. at 874, 200 S.E. at 314. Interpreting the predecessor statute to O.C.G.A. § 15-16-24, the Georgia court determined that sheriffs may be liable for the misconduct of jailers only when this misconduct "is a breach of some duty arising out of official capacity." *Id.* at 875, 200 S.E. at 314. After describing the jailer's official duty as limited to the care of prisoners required to be received by the sheriff (which did not include municipal prisoners), the court concluded that "[a]s an officer the jailer owed no duty to the municipal prisoner." *Id.* at 875-76, 200 S.E. at 315.

[26]In this regard, Georgia law appears similar to Alabama law. In concluding that jailers were state officials in *Lancaster v. Monroe County,* 116 F.3d 1419, 1429 (11th Cir.1997), we noted differences between jailers and deputies:

32

because this case does not involve a jailer who is not a deputy, our belief about immunity is necessarily limited to sheriffs and sheriffs' deputies serving as jailers.

## I. *Lack of County Control*

In contrast to the state's control over sheriffs, counties in Georgia do not create or control sheriffs' law enforcement powers, duties, and training, and have no role in either the investigation or suspension of sheriffs or in the hiring, training, supervision, and discipline of their deputies.

The county's lack of control over the sheriff's duties is in stark contrast to the powers the county exercises over its own police department. For example, a county police force is created only pursuant to a resolution or ordinance of the county governing authority followed by the approval of qualified county electors. O.C.G.A. § 36-8-1(b). Although county police officers have powers similar to those of sheriffs, county police officers are expressly subject to the "direction and control of the county governing authority." O.C.G.A. § 36-8-5. The fact that the county may have its own county police department is further indicia of how independent the sheriff's office is from the county.

---

[U]nder Alabama law jailers carry out the sheriff's duty to maintain "legal custody and charge of the jail in his county and all prisoners committed thereto." Although jailers may not function as an "extension" of the sheriff to the same degree that deputies do, because a jailer cannot undertake every act that the sheriff could perform, nevertheless, jailers are responsible to the sheriff for their performance of state-mandated duties. Sheriffs and jailers have a close working relationship under Alabama law.

That working relationship is not sufficiently intruded upon by county control to deny jailers Eleventh Amendment immunity for official capacity claims.... Payment of salaries-especially when required by law-does not establish county control over the jailers for Eleventh Amendment purposes.

116 F.3d at 1429-30 (internal citations omitted).

33

We readily acknowledge that Georgia law grants the county significant control of the "purse strings" of the sheriff's office. The sheriff's salary is paid from county funds. O.C.G.A. § 15-16-20. The county board sets the total amount of the sheriff's operating budget and pays the premium for the sheriff's official bond which is required to be $25,000. *See* O.C.G.A. §§ 36-5-22.1, 45-4-7, 15-16-5; *Chaffin v. Calhoun,* 262 Ga. 202, 203, 415 S.E.2d 906, 907 (1992). This financial control, however, is limited because (a) the Georgia legislature has mandated the minimum salary to be paid to a sheriff and the minimum official bond for which the county pays the premium, and (b) the Georgia Supreme Court has held that "the county commission may not dictate to the sheriff how that budget will be spent in the exercise of his duties," and the budget "must provide reasonably sufficient funds to allow the sheriff to discharge his legal duties." *Chaffin,* 262 Ga. at 203-04, 415 S.E.2d at 907;[27] *see also Boswell v. Bramlett,* 274

[27]In *Chaffin,* the county, over the sheriff's objection, shifted the responsibility for patrolling and drug enforcement to the new county police department and reduced the sheriff's budget by forty-seven percent. 262 Ga. at 202-04, 415 S.E.2d at 907-08. The trial court granted the county's request for an injunction requiring the sheriff to cooperate in the implementation of the plan to transfer personnel and equipment to the newly created county police department. *Id.* at 202, 415 S.E.2d at 907. The Georgia Supreme Court affirmed, holding the trial court had not abused its discretion in finding that the remaining budget was sufficient to allow the sheriff to perform his duties. *Id.* at 204, 415 S.E.2d at 908. In doing so, the Georgia Supreme Court reaffirmed that: (1) "Sheriff Chaffin is an elected constitutional officer," citing Article IX, § 1, ¶ 3(a) of the Georgia Constitution; (2) "[t]he sheriff is not an employee of the county commission," citing *Board of Commissioners of Randolph County v. Wilson,* 260 Ga. 482, 396 S.E.2d 903 (1990); and (3) although the county commission has the power to create a county police force, "the commissioners could not divest the sheriff of his power and duty to enforce the laws and preserve the peace," either directly or indirectly by exercise of their fiscal authority or control of county property, citing *Wolfe v. Huff,* 232 Ga. 44, 45, 205 S.E.2d 254 (1974). *Chaffin,* 262 Ga. at 203-04, 415 S.E.2d at 907-08.

In another budget battle between the sheriff and county commission in *Board of Commissioners of Randolph County v. Wilson,* 260 Ga. 482, 396 S.E.2d 903 (1990), the sheriff requested $70,000 to pay deputies but the county commission budgeted a lump sum of only $60,080. *Id.* at 482, 396 S.E.2d at 904. The Georgia Supreme Court held that the county commission did not abuse its authority, viewing the case as "involving the power of the commission to approve the sheriff's budget rather than the power of the sheriff to hire deputies."

Ga. 50, 52, 549 S.E.2d 100, 102-03 (2001) (concluding county government approves the superior court clerk's budget but does not control how that constitutionally-elected officer spends the budget). The Georgia Constitution further prevents counties from taking any action affecting any elective county office or the personnel thereof. Ga. Const. Art. IX, § 2, ¶ 1(c)(1). Payment of the sheriffs' salaries and equipment from county funds, when required by the state legislature, does not establish county control over the sheriff.[28]

In addition to setting the total amount of sheriffs' budgets, the counties in Georgia do control the jail structures. Specifically, counties have the responsibility "to erect or repair, when necessary, their respective ... jails ... and to furnish each with the furniture necessary for the different rooms, offices, and cells." O.C.G.A. § 36-9-5. The county board's role in maintaining the jail structure itself, however, has no impact on the sheriff's law enforcement policies as to use of force or on his training, hiring, supervision, or discipline of his deputies.[29]

---

*Id.* at 484, 396 S.E.2d at 905.

[28]Similarly, Alabama sheriffs are elected by county voters and paid from county funds, but the Supreme Court in *McMillian* found these factors insufficient to establish county control over sheriffs. *See McMillian,* 520 U.S. at 791, 117 S.Ct. 1734 ("The county's payment of the sheriff's salary does not translate into control over [the sheriff], since the county neither has the authority to change his salary nor the discretion to refuse payment completely."). The Supreme Court also concluded that the ability of the county governing authority to reduce the sheriff's budget so long as it remains reasonable results in "attenuated and indirect influence over the sheriff's operations." *See id.* at 792, 117 S.Ct. 1734.

[29]*See Turquitt,* 137 F.3d at 1289-90 (concluding that Alabama laws that require county commissions to erect and maintain jail structures do not relate to the daily operation of the jails and supervision of inmates). In *Griffin v. Chatham County,* 244 Ga. 628, 261 S.E.2d 570 (1979), the Georgia Supreme Court did conclude that the sheriff must accept city prisoners since the county commission had entered a contract with the City of Savannah to maintain city prisoners in the county jail. *Id.* at 629-30, 261 S.E.2d at 571-72. However, *Griffin* involved an act by the state legislature that was applicable to only Chatham

Manders relies primarily on O.C.G.A. § 42-5-2(a) which provides, in part: "[I]t shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention."[30]  By this statute, the state has made counties responsible for providing certain necessities to inmates but has not imposed any county control over sheriffs' law enforcement activities regarding use of force at county jails.  At most, O.C.G.A. § 42-5-2 imposes complementary but distinct duties upon counties and sheriffs but not control over sheriffs.  Manders does not allege that he was denied any necessities listed in O.C.G.A. § 42-5-2, but challenges only Sheriff Peterson's law enforcement policies regarding use of force and his training, supervision, and discipline of his deputies as to use of force at the jail.

*J.    Sovereign Immunity*

Finally, we discuss sovereign immunity under Georgia law for two reasons. On one hand, Georgia's extension of sovereign immunity to sheriffs evinces the

---

County.  That local act granted the Chatham County commissioners considerable power over the county jail as follows:  "Said Commissioners (of Chatham County) shall have power to maker proper rules and regulations for the government and control of said jail of Chatham County, and the prisoners and inmates therein, and, except as hereinbefore provided, are hereby invested with the management and care of said jail." *Griffin,* 244 Ga. at 630 n. 8, 261 S.E.2d at 572 n. 8. In this case, there is no similar local act regarding the Clinch County jail.

[30]We reject Sheriff's Peterson's contention that O.C.G.A. § 42-5-2 does not apply to county jails merely because this provision is included in the chapter of Title 45 entitled "Correctional Institutions." *See Cherokee County v. North Cobb Surgical Assocs.,* 221 Ga.App. 496, 499, 471 S.E.2d 561, 564 (1996) ("Although [O.C.G.A. § 42-5-2] is included in the chapter of Title 42 that concerns correctional institutions, it nevertheless indicates that it is the intent of the legislature that governmental entities should pay for the medical expenses incurred by inmates who are in their physical custody."). Georgia courts have applied O.C.G.A. § 42-5-2 to require counties to provide medical care to inmates in county jails or detention centers. *See, e.g., Epps v. Gwinnett County,* 231 Ga.App. 664, 670, 499 S.E.2d 657, 663 (1998); *Macon-Bibb County Hosp. Auth. v. Houston County,* 207 Ga.App. 530, 531-32, 428 S.E.2d 374, 375-76 (1993).

sheriff's being an agent of the state.  On the other hand, Georgia law also extends sovereign immunity to counties and permits a county's purchase of motor vehicle insurance to waive a sheriff's sovereign immunity in that regard, which reflects some county control over the sheriff's motor vehicle liability.

Specifically, the Georgia Constitution provides that "[s]overeign immunity extends to the state and all of its departments and agencies."  Ga. Const.  Art. I, § 2, ¶ 9(e).  The Georgia Supreme Court has interpreted this extension of sovereign immunity to the "state and all of its departments and agencies" to insulate counties and all levels of government from state law claims unless immunity has been waived.  *See, e.g., Cameron v. Lang,* 274 Ga. 122, 126, 549 S.E.2d 341, 346 (2001);  *Gilbert v. Richardson,* 264 Ga. 744, 747, 452 S.E.2d 476, 479 (1994).[31] Thus, in Georgia, "[s]uits against 'public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity.' " *Cameron,* 274 Ga. at 126, 549 S.E.2d at 346 (quoting *Gilbert,* 264 Ga. at 750, 452 S.E.2d at 476);  *Gilbert,* 264 Ga. at 750, 452 S.E.2d at 476 (quoting *Donaldson v. Dept. of Transp.,* 262 Ga. 49, 56, 414 S.E.2d 638, 643 (1992) (Hunt, J., concurring));  *Crisp County Sch. Sys. v. Brown,* 226 Ga.App. 800, 802, 487 S.E.2d 512, 515 (1997).

In addition, Georgia courts have concluded that sovereign immunity

---

[31]*But see City of Thomaston v. Bridges,* 264 Ga. 4, 7, 439 S.E.2d 906, 909 (1994) (holding phrase "state and all of its departments and agencies" does not include municipalities);  *Thomas v. Hosp. Auth. of Clarke County,* 264 Ga. 40, 42, 440 S.E.2d 195, 196 (1994) (concluding hospital authority-although a governmental instrumentality-is not an agency or department of the state entitled to sovereign immunity).

protects sheriffs sued in their official capacities from state law claims. *See, e.g.,*

*Seay v. Cleveland,* 270 Ga. 64, 65-66, 508 S.E.2d 159, 160-61 (1998); *Gilbert,*

264 Ga. at 754, 452 S.E.2d at 484.[32] The *Seay* plaintiffs sued the sheriff in his

official capacity, alleging (1) that the sheriff was liable for his deputies' negligent

disbursement of funds at a sheriff's sale and (2) that the sheriff negligently

supervised his deputies. 270 Ga. at 64, 508 S.E.2d at 160. In *Seay,* the Georgia

Supreme Court concluded the plaintiffs' "claims against [sheriff] Seay in his

official capacity are precluded under the doctrine of sovereign immunity and it has

not been established in this case that such immunity has been waived." *Id.* at 65,

508 S.E.2d at 160.[33]

Sovereign immunity can be waived in Georgia but only by an act of the

Georgia legislature. Ga. Const. Art. I, § 2, ¶ 9(e); *Cameron,* 274 Ga. at 126 n. 25,

549 S.E.2d at 346 n. 25. To effect a waiver, the legislative act must provide that

sovereign immunity is waived and the extent of such waiver. Ga. Const. Art. I, §

---

[32]State sovereign immunity has no application in federal court in § 1983 cases. In contrast, the Eleventh Amendment grants immunity to states from suits in federal courts. *See, e.g., Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n,* 226 F.3d 1226, 1231 (11th Cir.2000); *Hufford v. Rodgers,* 912 F.2d 1338, 1340-41 (11th Cir.1990). In addition, when parties raise federal claims under § 1983 in state courts, then federal law must determine whether particular governmental entities are subject to suit. *See Howlett v. Rose,* 496 U.S. 356, 375-78, 383, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990).

[33]The Court in *Seay* recognized that if the plaintiffs had sued the sheriff in his personal capacity for negligent supervision, the sheriff would have been protected from suit to the extent official (qualified) immunity applied. 270 Ga. at 65-66 & n. 1, 508 S.E.2d at 161 & n. 1. Georgia law distinguishes between (a) sovereign [governmental] immunity and (b) official [qualified] immunity. "[T]he doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity." *Cameron,* 274 Ga. at 123, 549 S.E.2d at 344; *see Gilbert,* 264 Ga. at 750, 452 S.E.2d at 481; *Donaldson v. Dept. of Transp.,* 262 Ga. 49, 54, 414 S.E.2d 638, 642 (1992); *Carter v. Glenn,* 249 Ga.App. 414, 416, 548 S.E.2d 110, 112 (2001); *Chamlee v. Henry County Bd. of Educ.,* 239 Ga.App. 183, 184, 521 S.E.2d 78, 79-80 (1999); *Crisp County Sch. Sys.,* 226 Ga.App. at 802, 487 S.E.2d at 515. Because this appeal involves only official capacity claims, we do not address personal capacity suits against sheriffs.

2, ¶ 9(e); *see, e.g., Crisp County Sch. Sys.,* 226 Ga.App. at 801-02, 487 S.E.2d at 514-15.[34] The Georgia legislature enacted such a waiver statute in O.C.G.A. § 33-24-51, which gives "a county, or any other political subdivision of this state" the discretion to purchase insurance regarding motor vehicles and provides that its governmental immunity shall be waived to the extent of the amount of insurance so purchased.[35]

We mention this waiver statute because the Georgia Supreme Court has held that a county's purchase of insurance for the sheriff's motor vehicles waives the sheriff's sovereign immunity to the extent of the insurance. *See, e.g., Cameron,* 274 Ga. at 126, 549 S.E.2d at 346; *Gilbert,* 264 Ga. at 749-51, 452 S.E.2d at 480-82; *Woodard v. Laurens County,* 265 Ga. 404, 405, 456 S.E.2d 581, 583 (1995). Moreover, these three waiver decisions treated the official capacity claims against the sheriff as claims against the county, concluded the sheriff sued in his official capacity was entitled to the benefit of the county's sovereign immunity, and then

---

[34]In addition, the Georgia Constitution provides that "[n]o waiver of sovereign immunity ... shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution." Ga. Const. Art. I, § 2, ¶ 9(f).

[35]In Georgia, "the defense of sovereign immunity to tort liability cannot be waived by the mere purchase of insurance coverage," but "can only be waived pursuant to a 'legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver.' " *Woodard v. Laurens County,* 265 Ga. 404, 405, 456 S.E.2d 581, 582 (1995) (quoting *Gilbert,* 264 Ga. at 748, 452 S.E.2d at 480). Sovereign immunity is also not waived if the claim in the particular case does not fall within the coverage of the relevant insurance. *See, e.g., Chamlee,* 239 Ga.App. at 186, 521 S.E.2d at 81; *Butler v. Dawson County,* 238 Ga.App. 808, 810-11, 518 S.E.2d 430, 432 (1999) (no waiver despite insurance where damages caused by county's negligence not connected with motor vehicles); *Long v. Hall County Bd. of Comm'rs,* 219 Ga.App. 853, 857, 467 S.E.2d 186, 190 (1996) (no waiver because liability was not predicated on official's use of insured vehicle but rather negligent failure to prevent inmate from escaping).

waived the sheriff's immunity to the extent the county had purchased insurance.[36]

While in *Seay* the sheriff's sovereign immunity appeared independently based, these motor vehicle-insurance cases appear to tie the sheriff's sovereign immunity to the county's. In sum, while Georgia extends sovereign immunity to sheriffs in their official capacities under its constitutional provision granting such immunity to the "state and all of its departments and agencies," the Georgia law also reflects some county control over waiver of the sheriff's immunity but only as to motor vehicles.

Having examined Georgia law, we now must weigh all of these Eleventh Amendment factors.

### K.    *Weighing Eleventh Amendment Factors*

Doing so, we first conclude that Sheriff Peterson is not an agent for Clinch County when performing his law enforcement duties regarding use of force.[37]

---

[36]For example, in *Gilbert v. Richardson,* plaintiffs sued the sheriff in his official capacity under respondeat superior for his deputy's negligence while driving to an emergency call. 264 Ga. 744, 745, 452 S.E.2d 476, 478 (1994). Reversing the summary judgment for the sheriff, the Georgia Supreme Court observed, albeit in a footnote, that "[a]though Walker County is not named defendant in this action, Millard was sued in his capacity as Walker County sheriff. Accordingly, the [plaintiff's] claims are, in essence, claims against Walker County and [Sheriff] Millard may raise any defense available to the county, including sovereign immunity." *Id.* at 747 n. 4, 454 S.E.2d at 479 n. 4. The Georgia Supreme Court then concluded that "[b]ecause he is being sued in his official capacity, [the sheriff] is entitled to the benefit of Walker County's sovereign immunity defense. Since, however, the county has waived sovereign immunity to the extent of its liability insurance coverage, [Sheriff] Millard's sovereign immunity defense is likewise waived to that extent." *Id.* at 754, 452 S.E.2d at 484. The Georgia Supreme Court affirmed the grant of summary judgment as to the deputy, concluding that the deputy was entitled to official (qualified) immunity because she was "performing an official discretionary function when the accident occurred." *Id.* at 753, 452 S.E.2d at 483.

[37]Although not addressing Eleventh Amendment immunity, the district courts in our circuit have reached similar conclusions in holding that Georgia sheriffs are not county policymakers under § 1983. *See Fletcher v. Screven County,* 92 F.Supp.2d 1377, 1379-80 (S.D.Ga.2000) (concluding in a § 1983 action that although Georgia law declares sheriffs to be county officers, and directs that counties elect and pay their sheriffs, it cedes to counties no meaningful level of control over a sheriff's law enforcement activities); *Frazier v. Smith,* 12 F.Supp.2d 1362, 1369 (S.D.Ga.1998) (declining to dismiss action against

40

Although sheriffs are designated "county officers," the Georgia Constitution and Code afford counties no authority, role, or control over (a) sheriffs' qualifications, minimum salary, law enforcement powers and duties, (b) the investigation and suspension of sheriffs, or (c) the training, supervision, and discipline of his deputies at the jail. Sheriffs are independent and separate from county boards to such a degree that Georgia courts have held that counties are not liable under state law for the actions of the sheriff or his deputies or his deputy jailers. Indeed, the state has mandated that sheriffs alone hire and fire their own deputies and jailers.

We recognize that counties set the total amount of sheriffs' budgets and pay sheriffs' salaries, but counties cannot reduce the sheriffs' minimum salaries and cannot dictate how that budget is spent. Counties may waive the sheriffs' sovereign immunity for motor-vehicle claims by purchasing insurance, but Eleventh Amendment precedent now makes clear that insurance or indemnification provided by a third party, such as the county, is not material to whether there is a risk of an adverse judgment or potential legal liability. Counties construct and maintain the county jails and must provide inmates certain necessities, but counties have no authority, role or control over the sheriffs' use-of-force policies at the jail. Thus, on balance, we believe sheriffs are not

the sheriff in his official capacity as redundant to the action against the county because "Sheriff Smith acts independently of Camden County, except for the County's fiscal review and support of the Sheriff's department" and "[t]here is no evidence ... to support the conclusion that Sheriff Smith is an agent of Camden County, or that the County ultimately is liable for his misconduct"); *Duffey v. Bryant,* 950 F.Supp. 1168, 1174-75 (M.D.Ga.1997) (reviewing a § 1983 action against the sheriff and his deputies for the wrongful death of a county jail inmate and granting summary judgment for the defendant Cook County Board of Commissioners and its chairman because "[i]t is well-settled in Georgia that a county and its commissioners are without authority over the sheriff or his deputies" and that its chairman "had no responsibility or authority for supervising or training officers").

agents of counties when performing their law enforcement duties as to use of force.

Although Sheriff Peterson does not represent the county, this does not mean by default that he is an agent of the state. We note that Georgia courts have held that public hospital authorities in Georgia are not entitled to sovereign immunity because they are not part of either the county or the state. *See, e.g., Thomas v. Hospital Auth. of Clarke County,* 264 Ga. 40, 41-42, 440 S.E.2d 195, 196 (1994) (noting "that there is a clear distinction between a political subdivision such as a county and a corporate body such as a hospital authority, which is a creation of the county"). Unlike hospital authorities though, the sheriff's office is not a corporate body but a constitutionally-elected office under the state Constitution, and Georgia courts have concluded sovereign immunity protects Georgia sheriffs in their official capacities. In addition, the parties here have not made the contention, nor have they cited any authority indicating, that the sheriff's department is a separate corporate body or even a separate legal entity capable of being sued under Georgia law.[38]

To some extent, Sheriff Peterson's adoption of use-of-force policies, his daily operation of the jail, and his supervision and discipline of deputies as to use of force are all independent from and unalterable by any governing body. Nonetheless, some outside control does exist, and it is the state, not the county, that possesses that control. For example, the state governs the qualifications,

---

[38]*See supra* note 6.

training, investigation, and suspension of sheriffs and their deputies. If a sheriff's use-of-force policies did permit misconduct, such as allowing excessive force against pre-trial inmates in the county jail, it is the state, not the county, that has the authority to act and has in fact exercised that authority by requiring annual training and prescribing a mechanism for investigation and suspension of sheriffs. In addition, it is the state that establishes the powers and duties of sheriffs, that empowers sheriffs to act as law enforcement officers, and that grants sheriffs, not counties, the physical custody of inmates in the counties' jails. These state laws result in the state controlling and regulating the sheriff's office in a meaningful way, albeit not on a daily basis.

Regarding what funds pay any adverse judgment, it is clear under Georgia law that counties are not liable for the misconduct of sheriffs and their deputies and that counties are not required to pay judgments arising from violations of the law by sheriffs in their official capacities. Further, under Supreme Court precedent, it is also true that a third-party's indemnity of, or purchase of insurance to pay, an adverse judgment does not defeat the cloak of immunity. Although counties provide funds for sheriffs' budgets, counties do so only because state law requires they fund the sheriffs' offices and sheriffs alone control how those funds are used.

On the other hand, although state funds are used to train and investigate sheriffs, we can locate no Georgia law providing sheriffs with state funds to pay an adverse judgment. Nonetheless, recent Eleventh Amendment decisions

43

emphasize that it is the potential legal liability that counts. If by law the state treasury directly pays an adverse judgment, this one factor alone may possibly trigger Eleventh Amendment immunity and arguably make consideration of the other factors unnecessary. But, we cannot say that this one factor alone strips immunity unless state law expressly obligates states to pay adverse judgments against sheriffs in their official capacities. No such bright line of demarcation is usually drawn in Eleventh Amendment cases because immunity depends upon weighing various factors. The plaintiff here, as in *Lancaster* and *Carr,* has not shown that counties would pay a damages award, and indeed Georgia law provides counties would not. Thus, at a minimum, this factor does not tilt heavily one way or the other and does not defeat Sheriff Peterson's claim to immunity.

In sum, weighing all factors, we believe Sheriff Peterson in his official capacity is an agent of the state when performing his law enforcement duties regarding use of force and is entitled to Eleventh Amendment immunity.[39]

## IV. CONCLUSION

Nonetheless, our binding precedent requires us to conclude that Manders's remaining § 1983 claims against Sheriff Peterson in his official capacity are claims against Clinch County and not barred by the Eleventh Amendment. Accordingly,

---

[39]We also note that if sheriffs are agents of the state when executing certain law enforcement duties, then the plaintiff's § 1983 suit is subject to dismissal on the independent ground that neither states nor state officials acting in their official capacities are "persons" for purposes of § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). But that is a defense to liability and not a threshold immunity issue. In addition, our analysis here affects whether Sheriff Peterson is a policymaker for the state or county and the proceedings against Clinch County. But Clinch County is not a party to this appeal, and thus we address only the immunity defense of Sheriff Peterson in his official capacity.

we must affirm the denial of summary judgment against Sheriff Peterson in his official capacity.

AFFIRMED.